PDG CHEMICAL INC. and Equistar
Chemicals, L.P., Plaintiffs,

v.

The OIL, CHEMICAL AND ATOMIC
WORKERS INTERNATIONAL UN-
ION and Its Local 4–243 a/k/a Paper,
Allied—Industrial Chemical & Energy
Workers and Barry J. Baroni, Arbitra-
tor, Defendants.

Civil Action No. 1:00CV683.

United States District Court,
E.D. Texas,
Beaumont Division.

Oct. 11, 2001.

A. Martin Wickliff, Wickliff & Hall, Houston, TX, Olivia Tanyel Harrison–Bennett, Lyondell Chemical Co., Houston, TX, for plaintiffs.

Jane Swearingen Brown, Provost & Umphrey, Beaumont, TX, for defendants.

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SCHELL, District Judge.

This matter is before the court on Plaintiffs' Motion for Summary Judgment (Dkt.# 7) and Defendants' Motion for Summary Judgment (Dkt.# 9), both filed on January 16, 2001. Defendants filed a response to Plaintiffs' motion on February 2, 2001 (Dkt.# 10) and Plaintiffs filed a reply on February 20, 2001 (Dkt.# 12). Additionally, Plaintiffs filed a Motion for Leave to File Plaintiffs' Statement of Undisputed Facts and Response to Defendants' Motion for Summary Judgment (Dkt.# 11) on February 20, 2001.[1] Upon consideration of the motions for summary judgment, responses, reply, and the applicable law, the court is of the opinion that the Plaintiffs' motion should be GRANTED in part and DENIED in part and the Defendants' motion should be DENIED.

Plaintiffs, Equistar Chemicals, LP ("Equistar") and PDG Chemical Inc. ("PDG") (collectively the "Company"),

1. The court GRANTS Plaintiffs' motion for leave and will consider the statement of undisputed facts and response to Defendants' motion for summary judgment when deciding the issues presented.

brought this suit against the Oil, Chemical and Atomic Workers International Union, Local 4–243 (the "Union") and Barry J. Baroni seeking a declaratory judgment on the arbitrability of a grievance filed by the Union with the Company. Specifically, Plaintiffs request that the court make a determination, under the terms of the Collective Bargaining Agreement and Equistar's Savings and Investment Plan, that they are not required to arbitrate the Union's grievance since it is based on or relates to the terms and conditions of the Savings and Investment Plan. They also seek a permanent injunction prohibiting the Union from seeking to arbitrate this grievance or any grievance arising from or related to the Savings and Investment Plan in the future. Conversely, Defendants' motion for summary judgment seeks an order compelling arbitration of a grievance which alleges that Equistar has failed to properly calculate benefits under the Savings and Investment Plan.

## I. Factual Background

Equistar is a petrochemical company based in Houston, Texas, which also has a production and maintenance operation in Beaumont, Texas. On May 6, 1996, PDG entered into a Collective Bargaining Agreement ("CBA" or "agreement") with the Union which remains in effect to date. On May 15, 1998, Occidental Petroleum Corporation, which owned half of the shares of stock in PDG, transferred its stock in PDG to Equistar. In connection with the stock transfer, Equistar agreed to continue to employ the workforce at PDG's Beaumont plant.

Along with the stock transfer, certain changes were made in company policy including changes in the agreement with the Union. On June 1, 1998, Equistar entered into a "Memorandum of Agreement" ("memorandum") with the Union which outlined the modifications to the CBA. The memorandum described several benefit plans provided by the Company for the benefit of the bargaining unit employees. The current dispute involves the "Savings and Investment Plan" which is referred to in the memorandum. The Savings and Investment Plan is essentially a pension plan.

The memorandum provided that the bargaining unit employees would participate in the Equistar Savings Plan for Former OxyChem Employees (the "old plan") between June 1, 1998 and December 31, 1998.[2] Under the agreement, starting on January 1, 1999, the bargaining unit employees' right to participate in the old plan terminated and Equistar implemented the terms of its plan—the "Equistar Savings and Investment Plan" or the "Equistar Plan." According to the CBA and the memorandum, the Union's members became subject to the same schedule, terms, and conditions under the Equistar Plan as salaried employees.

A dispute arose between Equistar and the Union concerning the calculation of benefits under the Equistar Plan for the 12–hour shift employees. The Union alleged that the 12–hour shift employees were not being treated fairly.[3] The Defen-

---

**2.** That old plan was substantially similar in all material aspects to the plan that Occidental had sponsored before the stock transfer.

**3.** Equistar has several categories of employees whose wages and benefits are calculated differently depending on their classification. The primary categories are bargaining unit

employees (or Union members), who are paid on a hourly basis and subject to a collective bargaining agreement, and salaried employees who are not subject to the collective bargaining agreement. Within the bargaining unit group, employees are divided into 12–hour shift employees and 8–hour shift em-

dants claim that when the pension plan shifted on January 1, 1999 that the benefits received by the 12–hour shift employees were decreased. The union contends that the decrease is a violation of the CBA because the same schedule, terms, and conditions are not being applied to hourly and salaried employees. The 12–hour shift employees specific complaint is that their base-pay for purposes of pension plan contributions has been decreased. The Company does not dispute that under the Equistar Plan the 12–hour shift employees' base pay is calculated to be lower than it was under the old plan for purposes of pension plan contributions.

On November 22, 1999, the Union filed a grievance with the Company concerning this dispute. After the grievance process was exhausted, the parties still had not resolved the dispute and the Union sought to proceed to arbitration. The preliminary stages of the arbitration process were commenced, but a few days prior to the date that this dispute was to be arbitrated, the Company filed this action. Although this court is not charged with resolving the underlying grievance in this case and is in fact prohibited from making such a ruling, in order to make a determination as to whether this dispute is arbitrable, an understanding of the grievance is important.

The discrepancy in the benefits received by the 12–hour shift employees is brought about by the definition of "base pay" in the Equistar Plan. The Equistar Plan defines base pay to include "annual, actual wages or salary paid to a Member for the Member's personal service as the Member's base rate of pay ... but excluding extra pay such as overtime." (emphasis added). This base pay figure is then used in calculating the amount of money that an employee can contribute to the pension plan. This in turn affects the amount that the Company will contribute.[4]

Under the old plan, 12–hour shift employees calculated their yearly base pay by multiplying their yearly "in schedule" hours of work by their "8–hour pay rate."[5] Under the Equistar Plan, 12–hour shift employees calculate their yearly base pay by multiplying their yearly "in schedule" hours of work by a "12–hour pay rate." This 12–hour pay rate is a product of the "12–hour shift agreement."[6] In that agreement, both parties agreed that the 12–hour schedule must not have any adverse effects on Plant operation.

So as not to adversely affect the Plant, the parties agreed upon four specific factors to include in the agreement—only one of which is pertinent to this discussion. The parties agreed that labor costs and overtime would not increase as a result of the 12–hour shifts. To that end, the parties developed an adjusted pay rate to compensate for the increase in pay that

---

ployees. These are the only two classifications relevant to this discussion.

4. The maximum amount that an employee can contribute is based upon a percentage of base pay. Therefore, the higher the employee's base pay, the more that employee can contribute to the plan. Additionally, the amount that the Company contributes is based upon the amount that the employee contributes.

5. The 8–hour pay rate is the employee's actual hourly rate of pay. It is an employee's rate

of pay without any additional compensation for overtime, holiday pay, etc. Additionally, "in schedule" hours are the hours that an employee is regularly scheduled to work within a given year.

6. On October 11, 1991, the Company and the Union signed a 12–hour shift agreement for the Glycol Department employees, wherein the employees subject to the agreement changed their work day from an 8–hour day to a 12–hour day.

would result from the switch to 12–hour shifts.[7] This adjusted rate, the 12–hour shift employee's hourly rate multiplied by 0.87755, is the "12–hour rate" used to calculate base pay under the Equistar Plan for the 12–hour shift employees. The Equistar Plan substitutes the 12–hour rate for the 8–hour rate when calculating base pay for 12–hour shift employees.[8] For clarity, the court will provide an example. Suppose a 12–hour shift employee is scheduled for 2000 hours in a given year and that his pay rate is $20.00 an hour. Under the old system, the employee's base pay would be $40,000.[9] Under the Equistar Plan, the same employee's base pay would be $35,102, because of the adjusted rate.[10] Therefore, under the Equistar Plan the 12–hour shift employees are not allowed to contribute as much to the Savings and Investment Plan as they were under the old plan because their base pay is calculated to be lower.[11] Essentially, the grievance is a dispute concerning benefits under Equistar's Savings and Investment Plan.

## II. SCOPE OF THE COURT'S INQUIRY

■ The obligation to arbitrate a dispute is a matter of contract, and therefore, a party which has not agreed to arbitrate a dispute cannot be forced to do so. *See AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Moreover, a party that objects to arbitration because it did not agree to arbitrate the disputed issue is entitled to a judicial determination as to whether the collective bargaining agreement creates a duty for the parties to arbitrate the grievance. *See id.* at 649, 106 S.Ct. 1415.

■ The scope of a district court's inquiry in determining whether a grievance is subject to arbitration is limited. *See District 37 of Int'l Ass'n of Machinist & Aerospace Workers v. Lockheed Eng'g & Mgmt. Servs. Co.*, 897 F.2d 768, 771 (5th Cir.1990). As this court has previously noted, "[t]he court's only duty is to determine whether a party has asserted grievances that are subject to the arbitration clause found in the particular collective bargaining agreement." *Sabine Indep. Seagoing Officers Ass'n v. Sabine Towing & Transp. Co.*, 805 F.Supp. 430, 433 (E.D.Tex.1992). In making this determination, the district court is guided by certain principles established by the Supreme Court. As this court recognized in *Sabine*, these principles are: first, arbitration is a matter of contract and a party cannot

---

**7.** The CBA requires overtime to be paid anytime an employee works over eight hours in one day. Accordingly, an employee working a 12–hour shift would be compensated for 8 hours straight time and 4 hours overtime. Thus, labor costs would have increased because overtime is paid at a rate one and a half times that of the regular hourly rate. Without some adjustment in the pay rate, it was determined that the 12–hour shift employees would have been compensated as if they worked 196 hours in a month. By comparison, an 8–hour shift employee would only be compensated for 172 hours for working approximately the same number of hours as the 12–hour shift employees. To equalize the pay between the two groups and to avoid additional labor costs, it was determined that the base pay rate for 12–hour shift employees must be multiplied by a factor of 0.87755.

**8.** The 12–hour rate does not affect supervisors that work twelve hour shifts because they are salaried employees and their base pay is calculated by using their salary.

**9.** (2000 hours @ $20.00) = $40,000

**10.** (2000 hours @ ($20.00 * 0.87755)) = $35,102

**11.** Since the contributions are based on a percentage of base pay, if base pay is lower then the amount an employee is allowed to contribute will also be lower.

be required to submit to arbitration any dispute which he has not agree to submit; second, the arbitrability of a grievance is an issue for judicial determination; third, in deciding the arbitrability issue, the court is not to rule on the merits of the grievance; and fourth, the existence of an arbitration clause in a collective bargaining agreement raises a presumption of arbitrability.

*Id.* at 433 (citing *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)) (internal citations omitted).

■ If a grievance implicates a benefit plan, the court must also consider the terms of the plan. *Local Union No. 4–449, Oil, Chemical & Atomic Workers Union v. Amoco Chemical Corp.,* 589 F.2d 162, 164 (5th Cir.1979). When a benefit plan provides a specific procedure for resolution of disputes arising under the plan, a court must consider the terms of that procedure in determining whether the claim is arbitrable. *See id.* at 164. An additional factor to consider is whether the plan provides that the decision of its administrators will be final and binding. *Id.* By including such a provision in its plan, the employer "expresses an intention to exclude from arbitration all benefit disputes which are within the Administrator's authority." *United Steelworkers of Amer. v. Commonwealth Aluminum Corp.,* 162 F.3d 447, 451 (6th Cir.1998). Whether the grievance is arbitrable is a matter of law for the court to decide. *See Amoco,* at 164.

### III. ANALYSIS

■ The only issue before this court is whether the parties agreed to submit the underlying grievance in this case to arbitration. To determine whether this grievance is arbitrable, the court must look to the language of the agreement in conjunction with the pension plan. *See Amoco,* at 163–64 (looking to the language of the CBA and a disability and benefit plan when determining the arbitrability of a grievance concerning benefits under the plan).

Article XVII of the CBA, titled "Complaints and Grievances," states that "[a] complaint or grievance is defined as a dispute or controversy between the Company and the Union involving interpretation or application of the provisions of the Agreement."

Article XVIII of the CBA, titled "Arbitration," provides for arbitration "in the event a grievance which alleges a violation of a specific section or sections of this Agreement has not been settled under the complaint or grievance procedure, said grievance may be submitted by the Union to arbitration. The demand for arbitration shall be in writing." Further, Article XVIII limits the power of an arbitrator by not allowing the arbitrator "to make a decision that would in any way modify, change, add to, or delete any of the terms of provisions of the Agreement, nor shall they have any authority in making of a new agreement."

Article XXIV of the CBA, titled "Benefit Program," provides:

(2)(f) Savings & Investment Plan *

---

* The Company (Occidental Chemical, Inc.) and the Union (Oil, Chemical, and Atomic Workers International Local 4–243) have signed separate Memorandums of Agreement that cover the legal obligations of both parties concerning changes in the OPC Medical Care Plan, OPC Dental Care Plan and the Occidental Chemical Corporation Savings & Investment Plan.[12]

---

**12.** The new-memorandum between Equistar and the Union has replaced the memorandum referred to in this section. Additionally, the Equistar Plan has replaced the Occidental Plan.

The relevant provision of the Memorandum of Agreement, which is referred to in and incorporated by the CBA, provides:

From 6/1/98 through 12/31/98, employees covered under this Agreement will be eligible to participate in the "Equistar Savings Plan for former OxyChem Employees," according to the same schedule, terms and conditions as available to salaried employees of the PD Glycol Plant. Effective on or about 1/1/99, employees covered under this Agreement will transition to the Equistar Savings and Investment Plan, according to the same schedule, terms and conditions as available to salaried employees of the PD Glycol Plant. *The Equistar Savings and Investment Plan will then remain in full force and effect for the duration of this Agreement, with the terms of the Plan being at the sole discretion of the company.* In the event the company does so modify the Plan, for all program participants, the company will notify the union of the changes and the effective date of such changes. (emphasis added).

Section 11.8 of the plan, titled "Benefits Administrative Committee: General Administrative Powers and Duties," which is referred to in the memorandum states:

As part of its overall administrative responsibility for the Plan, and subject to any contrary determination by the Partnership Governance Committee, the Benefits Administrative Committee shall have the *exclusive responsibility* for the general administration of the Plan, according to its terms and provision, and shall have **all discretion and powers to accomplish its purposes,** including without limitation, the right power, authority and duty:

\*    \*    \*    \*    \*    \*

Whenever the Benefits Administrative Committee, under its discretionary powers, is required to construe or interpret this Plan or decide any controversy or questions relating to Plan eligibility or *benefits payable to any Member* or beneficiary, the Benefits Administrative Committee's interpretation, decision or judgment on that issue shall be considered final, binding and conclusive for all affected persons.[13] (emphasis added).

**13.** Section 11.8 outlines several specific duties that are reserved for the Benefits Administrative Committee. Relevant to the issue in this case are the following examples:

(b) to construe and interpret all terms, provision, conditions, limitations of the Plan, and the Benefits Administrative Committee's construction and interpretation shall be final and conclusive on all persons or entities;

(c) to correct any defect, to supply any omission, or to reconcile any inconsistency that may appear in the Plan in the manner and to the extent as the Benefits Administrative Committee shall deem necessary or appropriate; and the Benefits Administrative Committee's judgment in such matters shall be final, conclusive and binding on all persons and entities.

(d) to decide all questions of eligibility of employees to become Members, to determine the amount, manner and time of pay-

ment of any benefits under the Plan, including all finding of facts necessary to make such decision and determinations, and to prescribe procedures to be followed by distributees in obtaining benefits;

(e) to determine all controversies relating to Plan administration, including without limitation: (i) differences of opinion arising between the Company or any Subsidiary or Affiliate and the Trustee or a Member, or any combination thereof and (ii) any questions the Benefits Administrative Committee deems advisable to determine in order to promote nondiscriminatory Plan administration for the benefit of the Members and beneficiaries;

(f) to make a determination as to the rights of any person to a benefit and to afford any person dissatisfied with such determination the right to a full and fair review in accordance with the provision of Paragraph 11.12.

The Company contends that since the plan is incorporated into the CBA and the plan provides that the Benefits Administrative Committee has exclusive responsibility for the general administration of the plan, that the grievance in this case is not arbitrable. Conversely, the Union claims that the grievance is arbitrable. To support its position, the Union looks to the language in the arbitration clause that allows for arbitration when a specific section of the agreement has been violated and not resolved in the grievance process. The section that the Union alleges has been violated by the Company is the section in the memorandum that states that Union "employees covered under this Agreement will transition to the Equistar Savings and Investment Plan, according to the same schedule, terms and conditions as available to salaried employees." Specifically, the Union's complaint is that the union employees are not subject to the same terms and conditions as the salaried employees under the Savings and Investment Plan.[14]

The court finds that this case is similar to *Local Union No. 4–449, Oil, Chemical & Atomic Workers Union v. Amoco Chemical Corp.*, 589 F.2d 162, 164 (5th Cir. 1979), and should be resolved in accordance with the holding of the Fifth Circuit in that case. In *Amoco*, the grievance the union sought to arbitrate was based on the Company's failure to pay certain sick pay benefits. As in this case, the union and the company had a CBA in place and a separate benefit plan which was incorporated into the CBA—the terms of which were set forth in the benefit plan. After examining the pertinent sections of the CBA and the plan, the court in *Amoco* found that, although the agreement did not expressly exclude disputes concerning the plan from arbitration, the plan clearly stated that "the Board reserves the right to interpret and apply the Plan, and that the decision of the Board will be final." *Id.* at 164. The court in *Amoco* concluded that when looking at the plan in conjunction with the agreement, although not expressly excluded, it was clear that the inclusion of the language giving the Board complete authority and making the board's decisions binding, excluded disputes concerning benefits under the plan from arbitration.

In the present case, the CBA includes an arbitration clause which states that a grievance, concerning a violation of a specific section of the agreement, that is not resolved will be sent to arbitration.[15] As in *Amoco*, the arbitration provision does not expressly exclude any type of grievance from the arbitration process—outside of limiting arbitration to violations of specific provisions. The memorandum of agreement, which is an amendment to the CBA, incorporates the Savings and Investment Plan. Section 11.8 of the plan clearly states that any controversy concerning benefits under the plan is the "exclusive responsibility" of the Benefits Administrative Committee. Additionally, section 11.8(e) states that the committee is to determine all controversies relating to plan

---

**14.** The Union also appears to allege that the Company is violating Appendix "A" concerning the 12–Hour Shift Agreement. However, the court does not view the Union's complaint as a violation of the 12–Hour Shift Agreement, but rather an application of the 12–Hour Shift Agreement under the terms of the plan. It is the application of the 12–Hour Shift Agreement under the plan and not a violation of 12–Hour Shift Agreement that the Union is actually complaining about. Further, no specific provision of the 12–Hour Shift Agreement appears to be violated since the 12–Hour Shift Agreement is silent with respect to its effect on the Savings and Investment Plan.

**15.** The parties do not dispute the validity of the arbitration clause. Therefore, the court will assume that it is valid.

administration, including differences of opinion between the Company and an employee. Further, the plan states that the decision or judgment of the committee will be final and conclusive on all parties.

It is clear under the language of the agreement and the plan that the parties intended to have disputes concerning the plan and benefits received under the plan to be decided by the Benefits Administrative Committee. The inclusion of the language in the plan that the company will have exclusive control over the plan and that interpretation of the terms and conditions of the plan will be in the sole discretion of the committee, obviously excludes from arbitration disputes concerning the Savings and Investment Plan.

Therefore, since the parties have agreed that disputes concerning benefits to be received under the Savings and Investment Plan are to be determined by the Benefits Administrative Committee and not by an independent arbitrator, the court is of the opinion that the Plaintiffs' Motion for Summary Judgment should be granted and the Defendants' Motion for Summary Judgment should be denied with regard to the arbitration of the specific grievance in this case.

■ Plaintiffs are also seeking a declaratory judgment that any grievance arising from the terms of the Equistar Plan, and/or the benefits due under the Equistar Plan are not arbitrable. As the discussion above shows, the parties have agreed that the Benefits Administrative Committee has exclusive responsibility to administer the plan and determine the rights of any employee to benefits under the plan. Accordingly, the court finds that any grievance arising from the terms of the Equistar Plan and/or benefits due under the plan is not arbitrable.

■ Plaintiffs further seek a permanent injunction preventing the Union from attempting to compel Plaintiffs to arbitrate the dispute at issue in this lawsuit. Since the court has determined that this dispute is not arbitrable and that the Benefits Administrative Committee has the exclusive right to deal with matters concerning the plan, the court will issue a permanent injunction preventing the Union from attempting to arbitrate this grievance.

## IV. ATTORNEY'S FEES

■ The Plaintiffs contend that they are entitled to attorney's fees in this case. Although the court has determined the arbitration issue in favor of the Plaintiffs, the court finds that the Union has not attempted to arbitrate this grievance in bad faith. Accordingly, the court finds that an award of attorney's fees is not warranted.

It is, therefore, ORDERED that the grievance at issue in this case is not subject to arbitration because the parties have agreed to allow the Benefits Administrative Committee to have exclusive responsibility over disputes involving the Savings and Investment Plan. Accordingly, the Plaintiffs's motion is GRANTED and the Defendants' motion is DENIED on this issue. It is further ORDERED that any grievance arising from the terms of the Equistar Plan and/or benefits due under the plan is not subject to arbitration, and therefore, the court GRANTS Plaintiffs' motion on this issue.

The court also GRANTS the Plaintiffs' request for a permanent injunction preventing the Defendant from attempting to arbitrate this grievance or any grievance arising from administration of Equistar's Savings and Investment Plan and/or benefits to be received under the plan.

It is further ORDERED that Plaintiffs' request for attorney's fees is DENIED.

Additionally, any other requested relief not specifically granted is DENIED.

It is so ORDERED.